John P. Desmond (Nevada Bar No. 5618)
jdesmond@gordonsilver.com
GORDON SILVER
100 West Liberty Street, Suite 940
Reno, Nevada 89501
Telephone: (775) 343-7500
Facsimile: (775) 786-0131

Gregory P. Stone (admitted *pro hac vice*)
gregory.stone@mto.com
Peter E. Gratzinger (admitted *pro hac vice*)
peter. gratzinger@mto.com
Adam R. Lawton (admitted *pro hac vice*)
adam.lawton@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Peter A. Detre (admitted pro hac vice)
peter.detre@mto.com
Eric K. Chiu (admitted pro hac vice)
eric.chiu@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Unwired Planet LLC, | Case No. 3:12-cv-504-MMD-VPC |
| Plaintiff, | **DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS** |
| vs. | |
| Google Inc., | |
| Defendant. | |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION.................................................................................................... 1

II.     ARGUMENT .......................................................................................................... 2

        A.      The Court Has Broad Discretion To Bifurcate Patent Cases ..................... 3

        B.      Bifurcation Would Promote A Fair Trial By Avoiding Unnecessary Juror
                Confusion ................................................................................................... 3

                1.      This Case Involves Multiple Unrelated Patents and Multiple,
                        Unrelated Google Products .............................................................. 3

                2.      The Complex Liability Issues In This Case Justify Bifurcation .................. 7

                3.      The Complexity Of The Damages Issues In This Case Further
                        Justifies Bifurcation........................................................................ 9

        C.      Bifurcation Of Liability Is Likely To Substantially Narrow The Damages
                Issue For Trial And Reduce The Discovery Burden On The Court And The
                Parties ....................................................................................................... 15

        D.      The Resolution of Liability Requires Little or No Overlap in the Proof
                Required to Establish Damages and Willfulness ...................................... 17

        E.      Bifurcation Would Not Unduly Prejudice Unwired Because Google And
                Unwired Are Not Competitors .................................................................. 19

III.    CONCLUSION ..................................................................................................... 19

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**FEDERAL CASES**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ..................................................................................... 3, 10, 13

*AVIA Grp. Int'l, Inc. v. Nike, Inc.*,
No. 91-0326, 1991 WL 340569 (D. Or. Sept. 17, 1991)........................................... 10, 16, 19

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
682 F.3d 1003 (Fed. Cir. 2012) ................................................................................................ 15

*British Telecomms. PLC v. Google Inc.*,
No. 11-cv-1249, 2013 WL 3814329 (D. Del. July 22, 2013) .................................... 9, 16, 20

*Cellectricon AB v. Fluxion Biosci., Inc.*,
No. 09-3150-RMW, 2011 WL 1557987 (N.D. Cal. Apr. 25, 2011) ......................................... 4

*Ciena Corp. v. Corvis Corp.*,
210 F.R.D. 519 (D. Del. 2002)...................................................................................... 3, 10, 16

*Enzo Life Sci., Inc. v. Digene Corp.*,
No. 02-00212, 2003 WL 21402512 (D. Del. June 10, 2003)..................................................... 9

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
820 F.2d 1209 (Fed. Cir. 1987) .................................................................................................. 3

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y.1970) ................................................................................... passim

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ..................................................................................................................... 19

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) .................................................................................... 2, 10, 13

*HTC Corp. v. Tech. Props. Ltd.*,
No. 08-0882-PSG, 2013 WL 4787509 (N.D. Cal. Sept. 6, 2013).......................................... 17

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007) (en banc) .............................................................................. 15

*Industrias Metalicas Marva, Inc. v. Lausell*,
172 F.R.D. 1 (D.P.R. 1997)............................................................................................. 16, 20

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases**

*Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*,
757 F. Supp. 2d 431 (D. Del. 2010) ....................................................................................... 4

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................................................... 12, 14

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ..................................................................................... 2, 11, 14

*Medtronic, Inc. v. W.L. Gore & Assocs., Inc.*,
No. 06-4455, 2008 WL 5158997 (N.D. Cal. Dec. 9, 2008) ..................................................... 16

*Oracle Am., Inc. v. Google Inc.*,
798 F. Supp. 2d 1111 (N.D. Cal. 2011) .................................................................................. 13

*Paine Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
587 F. Supp. 1112 (D. Del. 1984) .......................................................................................... 19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
763 F. Supp. 2d 671 (D. Del. 2010) ......................................................................................... 9

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ........................................................................................... 12, 14

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
719 F.3d 1305 (Fed. Cir. 2013) ....................................................................................... 16, 17, 19

*Smith v. Alyeska Pipeline Serv. Co.*,
538 F. Supp. 977 (D. Del. 1982) ............................................................................................ 16

*Swofford v. B & W, Inc.*,
336 F.2d 406 (5th Cir. 1964) ................................................................................................... 3

*Wyeth v. Abbott Labs.*,
Nos. 08-0230, -1021, 2010 WL 4553545 (D.N.J. Nov. 3, 2010) ............................................ 10

**STATUTES AND RULES**

35 U.S.C. § 284 ................................................................................................................ 2, 3, 15

Federal Rule of Civil Procedure 42(b) ....................................................................................... 3

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

OTHER AUTHORITIES

Shawn P. Miller, *Do "Fuzzy" Software Patent Boundaries Explain High Claim Construction Reversal Rates* at 2 (Feb. 7, 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2139146 ............................................... 17

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

## I.    INTRODUCTION

On September 19, 2012, Unwired Planet ("Unwired") filed this action against Google Inc. ("Google"), alleging infringement of ten patents and seeking damages and a finding that Google's alleged infringement is willful.  Compl., Dkt. No. 1.  Google has denied the allegations of infringement and has asserted that the patents-in-suit are invalid.  Answer, Dkt. No. 28.  Fact discovery is currently set to close on May 30, 2014, to be followed by a *Markman* hearing on July 22, 2014.  Scheduling Order, Dkt. No. 187.  Initial expert disclosures are due forty-five days after the Court's *Markman* Order, with expert depositions to be completed forty-five days after reply expert disclosures are made.  *Id.*  Dispositive motions are due thirty days after completion of expert discovery.  *Id.*  The pre-trial conference is scheduled for February 18, 2015.  *Id.*

The Court has taken important steps to simplify this dispute in advance of trial.  For instance, the Court reduced the number of asserted claims and limited the number of prior art references that may be asserted.  *See* Dkt. No. 188 at 8.  The Court has also stayed discovery related to three patents.  Further, as discovery has revealed weaknesses in Unwired's various claims, Unwired has determined—in compliance with the Court's order limiting the number of asserted claims—to no longer assert any claims from U.S. Patent Nos. 7,035,647 and 7,203,752.  Despite this simplification, this case remains complex, and that complexity gives rise to serious concerns about the ability of any jury to appreciate and fairly resolve the myriad of issues that will likely be presented to a jury in this case.

The trial of liability issues alone will be multifaceted and highly technical.  Unwired's Complaint alleges infringement of ten patents, and six of those patents are still being aggressively asserted by Unwired.  These six patents (or the "patents-in-suit") are allegedly infringed by ***nine*** different Google products—Maps, Earth, My Location, Google+ Location, Latitude, Play, Google Cloud Messaging, Cloud to Device Messaging, and Google Apps Mobile Management.  Numerous features of these various products are alleged to infringe and many of the allegedly infringing features function, "behind-the-scenes," unbeknownst even to jurors who use and are familiar with the allegedly infringing Google products.  In addition to being asked to resolve these many infringement issues, the jurors will be asked to render a verdict on the validity of the patents.

To do so, the jury will need to consider numerous prior art references (including other patents and patent applications, journal articles, and product and system manuals) each quite technical, testimony regarding those references, and prior art products and relevant testimony.

Patent damages determinations are not straightforward and often quite complex. If the patent is found to be valid and infringed, the jury likely will be asked to set a reasonable royalty for Google's use of the claimed invention. *See* 35 U.S.C. § 284; *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1077-78 (Fed. Cir. 1983). In making this determination, the jurors will be presented with evidence of a hypothetical negotiation and will be tasked with applying fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970) (the "*Georgia-Pacific*" factors), the last of which is the hypothetical negotiation itself. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). Each patent and each Google product likely will need to be considered separately by the jury, and since four products (Play, Google Cloud Messaging, Cloud to Device Messaging, and Google Apps Mobile Management) are alleged to infringe multiple patents, *see* Ex. A, the jury will most likely be presented with evidence of at least nine (or sixteen, if a separate negotiation is conducted for each patent asserted against each product) "hypothetical negotiations" taking place at varying times. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361-62 (Fed. Cir. 2006) ("Because [two different accused products] caused two separate infringements, and each infringement commenced on a different date, it follows that the reasonable royalties may well be different from each other."). Furthermore, Unwired contends that Google's infringement is "willful" and that damages should therefore be enhanced under 35 U.S.C. § 284. These allegations will predictably involve consideration of evidence that is unique to each patent.

In the interest of simplifying this highly complex trial for the jury and in order to meaningfully advance the interests of judicial efficiency and economy, Google moves to bifurcate the trial of liability issues from the trial of damages and willfulness, and to stay discovery and further proceedings regarding damages and willfulness until after a decision from the Federal Circuit with respect to the liability trial.

## II.    ARGUMENT

23178666.2

-2-                                                                3:12-cv-504-MMD-VPC

## A.    The Court Has Broad Discretion To Bifurcate Patent Cases

Courts have broad discretion pursuant to Federal Rule of Civil Procedure 42(b) to bifurcate issues in civil cases. *See Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1212 (Fed. Cir. 1987) ("Under Rule 42(b), a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management."); *see also Swofford v. B & W, Inc.*, 336 F.2d 406, 415 (5th Cir. 1964) (affirming the district court's authority to bifurcate in patent cases). District courts frequently exercise discretion to bifurcate (or even trifurcate) issues in patent cases, "both to simplify the issues . . . and to maintain manageability of the volume and complexity of the evidence due to the exceptional volume and complexity of evidence presented to a jury." *Ciena Corp. v. Corvis Corp.*, 210 F.R.D. 519, 521 (D. Del. 2002) (quoting Thomas L. Creel & Robert P. Taylor, *Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice*, 424 PLI/Pat. 823, 826 (1995)). Indeed, bifurcation of patent cases has become standard practice for many judges. *See id.* ("[B]ifurcation of complex patent trials has become common.") (citing Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705, 725 (2000)). In two orders issued on the same day, the District of Delaware "determined that bifurcation is appropriate, *if not necessary*, in all but exceptional patent cases." Order at 1, *Robert Bosch LLC v. Pylon Mfg. Corp.*, Case No. 08-0542-SLR, Dkt. No. 123 (D. Del. Aug. 26 2009) ("*Bosch* Order"), Ex. H (emphasis added); Order at 1, *The Dutch Brand of Streamserve Dev. AB v. Exstream Software, LLC*, Case No. 08-0343-SLR, Dkt. No. 82 (D. Del. Aug. 26, 2009) ("*Dutch Brand* Order"), Ex. I (emphasis added). In deciding whether to bifurcate, factors to be considered are juror comprehension, judicial economy and convenience, separability of the issues, and avoiding prejudice. *See, e.g.*, *Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 441 (D. Del. 2010); *Cellectricon AB v. Fluxion Biosci., Inc.*, No. 09-3150-RMW, 2011 WL 1557987, at *2 (N.D. Cal. Apr. 25, 2011).

## B.    Bifurcation Would Promote A Fair Trial By Avoiding Unnecessary Juror Confusion

### 1.    This Case Involves Multiple Unrelated Patents and Multiple, Unrelated Google Products

23178666.2

-3-

3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

There are six patents still being asserted by Unwired from which up to fifteen claims will be selected. Except for two patents, the '657 and '240 patents which are related, each of these patents-in-suit purports to cover a technology substantially different from that claimed in the other patents. Thus, the jury will need to become educated on each of these five different technologies before it can consider questions of patent validity and infringement. After achieving an understanding of these technologies, the jury then will need to compare each asserted claim to the product(s) or feature(s) that are alleged to infringe. To make that comparison, the jury will be tasked with understanding the functionality of Google's nine accused products. Although some jurors may have general familiarity with certain accused products (e.g., some jurors may use Google Maps or Google Earth), the patents-in-suit also are asserted against highly technical aspects of Google's products and services that will be unfamiliar to the jurors. The following is a brief overview of the patents-in-suit and Unwired's infringement contentions to provide the Court with a further understanding of the different technologies and infringement issues involved in this case.

### (a)     '657 and '240 Patents

U.S. Patent No. 6,292,657 ("'657 patent"), filed Jul. 13, 1998, Ex. B, and U.S. Patent No. 6,895,240 ("'240 patent"), filed Jul. 16, 2001, Ex. C, are related patents that share the same specification, meaning the written description of the alleged invention is the same in substance, and only the claims are different. These patents claim a system for managing a "fleet" of mobile devices. For example, the system described in the patents might be used when "a corporation wants to propagate an urgent proprietary message to its sale team on customer sites provided that the team members each have [a] mobile device." '240 patent at 1:55-58. In the language of the patent, the multiple mobile devices in the hands of the sales team would be considered a "fleet" of mobile devices, and the message that the corporation wanted to propagate to the whole sales team would be called "fleet data." *Id.* at 4:50-64. The entity that originates the request to "push" data to the "fleet" is referred to in the patent as the "provisioning entity." *Id.* at 7:26-28. The request is sent to a "fleet server" which, after verifying that the provisioning entity is authorized, forwards

23178666.2             -4-             3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

the data to a "proxy server" to be pushed to the fleet. *Id.* at 7:35-8:21; 12:17-20. For instance, this is much like pagers or similar devices used by trucking companies.

Unwired accuses Google Play, Google Apps Mobile Management, Google Cloud Messaging, and its predecessor, Cloud to Device Messaging as infringing both the '657 and '240 patents. (*See* footnote 1, *infra*, for a description of these accused products). Unwired most recently served 86 pages of infringement contentions with respect to the '657 patent, and 291 pages of infringement contentions with respect to the '240 patent. The infringement contentions are primarily directed to the "behind the scenes functionality" of the accused products, including the server-side architecture and authentication procedures allegedly used by Google Play, Google Apps Mobile Management, Google Cloud Messaging, and Cloud to Device Messaging.

### (b)   '786 Patent

U.S. Patent No. 6,654,786 ("'786 patent"), filed Aug. 30, 2000, Ex. D, describes a "unified interface" for "sending update notifications to different wireless clients on different wireless networks." *See* '786 patent Abstract. That interface, which the '786 patent interchangeably calls a "proxy server" or "gateway," sits between the Internet on one side and a wireless carrier network (e.g., a cell phone network) on the other side, as depicted in Figure 1 of the patent. The '786 patent explains, with reference to Figure 1, that the proxy server "performs mapping or translation functions, for example, mapping from one protocol to another." *Id.* at 3:63-67.

Unwired most recently served 42 pages of infringement contentions with respect to the '786 patent. The infringement contentions are directed to aspects of the server-side architecture and functionality of Google Cloud Messaging and Cloud to Device Messaging, which allegedly perform functions such as "forming" messages to "comply with the characteristics" of a wireless network. *See* '786 patent claim 1.

### (c)   '760 Patent

US. Patent No. 6,944,760 ("'760 patent"), filed May 24, 2001, Ex. E, describes a method for "protecting the identities of mobile devices on a wireless network." '760 patent at 1:10-11. The '760 patent explains that in existing systems as of 2001, when the patent was filed, there were web browsers on wireless devices or "clients" such as mobile phones capable of requesting, or

23178666.2

-5-

3:12-cv-504-MMD-VPC

"pulling," a web page from the Internet. *Id.* at 2:5-10. The request for the web page in those systems could result in the website learning identifying information about the requesting device, such as its phone number. *Id.* at 2:10-14. That identifying information could be used for legitimate purposes, but also exposed the requesting device to unwanted phone calls or other unsolicited messages. *Id.* at 2:21-41. The solution proposed in the '760 patent was to place an intermediary called a "proxy gateway" between the mobile device or "client" on one end, and the website on the other end, to encrypt the client identifier. Furthermore, the proxy was to encrypt the client identifier differently for each server by using a different encryption "key" for each server, thus preventing unwanted sharing of client identifiers. *See id.* at 4:23-38.

Unwired most recently served 8 pages of infringement contentions with respect to the '760 patent. The '760 patent is asserted against Google Play, and in particular, the uploading of device configuration information from the client to Google Play, and the subsequent sending of messages by Google Play to clients via Google Cloud Messaging, steps which allegedly use an encrypted identifier in the manner claimed by the '760 patent.

### (d)  '087 Patent

U.S. Patent No. 6,684,087 ("'087 patent"), filed May 7, 1999, Ex. F, claims a method and related apparatus for displaying images on a mobile device. Unlike the iPhones and Android phones of today, the mobile phones of the late 1990s—when the application for the '087 patent was filed—had little processing power, low-resolution displays, and slow download speeds. *See, e.g.*, '087 patent at 1:44-48. As a result, these phones often could not display pictures that users could view on a desktop PC. *Id.* at 5:12-15. The inventors of the '087 patent thus described starting originally with an image that was too large to be displayed on a phone, and using a server to "transform" that image into a "reduced image" that was more suitable for display on a phone, wherein this "transformation" would occur "with respect to a set of parameters associated with the screen." *Id.* at 9:27-39 (claim 1). The inventors also described allowing the user to select a region (referred to in the specification as a "subarea") of the "reduced image" and successively zoom in on the selected subarea of the original image—possibly in several steps—until the user saw the requested subarea in an unreduced form that could fit on the screen. To support this successive

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

zooming feature, the inventors explained that the server would use the original, larger image to create an "image hierarchy" between the "reduced image" and the original, large image. Each time the user zoomed in on a portion of the image on the screen, the server would provide the appropriate image from the next level of the hierarchy. *See id.* at 8:49-66.

Unwired most recently served 193 pages of infringement contentions with respect to the '087 patent. The '087 patent is asserted against the back-end processes on Google servers that allow users to "zoom" with Google Maps and Google Earth.

### (e)    '016 Patent

U.S. Patent No. 6,662,016 ("'016 Patent"), filed May 5, 2000, Ex. G, claims a method for displaying a map on a mobile device showing a marker with the location of a mobile resource (e.g., one's own location, or the location of another mobile device), by sending separate message sets with "mapping information" and "marker information" to the mobile device. *See* '016 patent Abstract. The patent explains that it was already known, as of the May 2000 filing date of the patent, to provide map displays with markers representing the location of a mobile resource. *Id.* at 1:43-58. For example, vehicle navigation systems used a combination of GPS transceivers and on-board computers with stored maps to provide such images. *See id.* What the '016 patent allegedly contributed to the prior art was a particular technique for providing maps with markers, involving the performance of certain processing steps on a server, followed by the separate transmission of the mapping information and the marker information to the client, and their combination on the client device, that allegedly provided certain processing advantages over prior art techniques. *See id.* at 2:37-60.

Unwired most recently served 236 pages of infringement contentions with respect to the '016 patent. The '016 patent is asserted against "My Location," which is the feature of Google Maps that allows one to see one's own location on a map (i.e., a blue dot), as well as Google+ and Google Latitude, which are Google services that may allow one to see the location of one's friends. Unwired's infringement contentions are primarily directed to processing steps that enable these services.

### 2.    The Complex Liability Issues In This Case Justify Bifurcation

As can be seen from the overview above, the patents-in-suit involve a large number of disparate technologies, all of which are likely to be unfamiliar to jurors, and are asserted against various technical aspects of Google's products and services that will also be unfamiliar to jurors. Furthermore, Google contends that each of the patents-in-suit is anticipated or rendered obvious by multiple pieces of prior art. Thus, jurors will also be required to assess the state of the art in protocol translation for wireless networks, image processing, identity encryption, and other technologies as of the late 1990s and early 2000s. Jurors will be required to synthesize this information to determine whether each of up to fifteen patent claims is infringed or not infringed, anticipated or novel, and obvious or non-obvious.

The task of deciding these complex liability questions is difficult enough—perhaps too difficult—without adding to it the complex and multi-faceted analysis of damages (reasonable royalty flowing from a hypothetical negotiation) and, possibly, a willful infringement analysis as well for each separate patent and Google product, quite possibly for a total of sixteen distinct hypothetical negotiations and willful infringement determinations. *See* Ex. A. Google is concerned that it is asking too much of any jury to resolve all of these issues in a singe trial and requests the Court exercise the "important discretionary tool" of bifurcation "to ensure that th[is] case [is] resolved in a just manner by juries that understand the complex issues before them." *Enzo Life Sci., Inc. v. Digene Corp.*, No. 02-00212, 2003 WL 21402512, at *5 (D. Del. June 10, 2003) (trifurcating infringement, validity, and related tort claims to "prevent jury confusion . . . [and] enable a jury to concentrate on one complex body of law at a time."). In a case similar in complexity to this one, the District of Delaware recently granted Google's motion to bifurcate damages issues from liability issues for expert discovery and trial to "reduce the risk of juror confusion." *British Telecomms. PLC v. Google Inc.*, No. 11-cv-1249, 2013 WL 3814329, at *2 (D. Del. July 22, 2013). In that case, the plaintiff asserted twenty-three claims in four patents, also against a large number of accused products. *Id.* at *1. The court characterized the case as "a complicated case, involving multiple patents, a variety of asserted claims, differing theories of infringement, and a wide range of accused products." *Id.* at *2. The court held in that context that

23178666.2                                    -8-                         3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

> it would be extremely difficult for a single jury to determine infringement and validity and concurrently craft a damages award that is consistent with whatever portion of the fifty or so accused products the jury finds to infringe particular valid patent claims. Requiring the parties' experts to formulate a host of contingent damages models, and to testify to the same before the jury, would be expensive and confusing as well.

*Id.* Likewise, in a case involving five patents and "at least eighteen asserted claims, three families of accused devices, and several infringement and invalidity theories for each patent-in-suit," the District of Delaware *sua sponte* severed the issue of damages for a separate trial because "trial of infringement (not to mention validity) will already present a complex task for the jury." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F. Supp. 2d 671, 689-90 (D. Del. 2010). In another example, the District of Oregon bifurcated liability and damages trials in a case involving five patents and "at least eight allegedly infringing products." *AVIA Grp. Int'l, Inc. v. Nike, Inc.*, No. 91-0326, 1991 WL 340569, at *2 (D. Or. Sept. 17, 1991); *see also Wyeth v. Abbott Labs.*, Nos. 08-0230, -1021, 2010 WL 4553545, at *2 (D.N.J. Nov. 3, 2010) (in a case involving three asserted patents and three accused cardiovascular stents, ordering bifurcation of the "highly complex" liability and damages phases of the case).

This case, involving six patents, fifteen claims, and nine very sophisticated software products, falls into the same category of cases with respect to the complexity of the liability analysis as *British Telecommunications* and the other cases cited above. In complex cases such as this one, fairness requires a separate jury to try damages so that the jurors can fully understand and embrace the issues before them. *See Ciena Corp.*, 210 F.R.D. at 521.

**3.    The Complexity Of The Damages Issues In This Case Further Justifies Bifurcation**

The damages and willfulness issues that may be presented to the jury are also complex, further warranting bifurcation. As discussed above, if the patents-in-suit are found to be valid and infringed, the jury will be tasked with determining a reasonable royalty for Google's use of each accused product based on a hypothetical negotiation with respect to each accused product. *See Hanson*, 718 F.2d at 1077-78; *Applied Med.*, 435 F.3d at 1361. The fact that there are multiple patents-in-suit and multiple accused products leads to a number of complexities that bifurcation could help alleviate. For example: (a) the facts relevant to many of the *Georgia-*

*Pacific* factors will vary among the six patents-in-suit; (b) different hypothetical negotiation dates apply for each accused product; (c) different licenses are relevant to each hypothetical negotiation; (d) different business models, revenues, and costs exist for each accused product; and (e) a willful infringement analysis may be required.

### (a)    Application of the *Georgia-Pacific* Factors

To determine a reasonably royalty, the jury will apply the *Georgia-Pacific* factors, the last of which is the hypothetical negotiation itself.  *See, e.g.*, *Lucent*, 580 F.3d at 1325-35. Those factors are:

1.    The royalties received by the patent owner for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

2.    The rates paid by the licensee for the use of other patents comparable to the patent-in-suit;

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.    The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5.    The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter;

6.    The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales;

7.    The duration of the patent and the term of the license;

8.    The established profitability of the product made under the patent; its commercial success; and its current popularity;

23178666.2

-10-                                    3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention;

11. The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use;

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14. The opinion testimony of qualified experts; and

15. The amount that a licensor (such as the patent owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount that a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit, and which amount would have been acceptable by a prudent patent owner who was willing to grant a license.

318 F. Supp. at 1120.

The facts relevant to many of the *Georgia-Pacific* factors will inevitably vary among the six patents-in-suit.  For example, with respect to *Georgia-Pacific* factors 1 and 2, the probative value of different Unwired or Google licenses might be different for different asserted patents covering different technologies and might be different for different hypothetical negotiations taking place at different times.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir.

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

2010) (rejecting the reliance on licenses with insufficient ties to the claimed invention); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 81 (Fed. Cir. 2012) (rejecting the exclusion of relevant licenses that were sufficiently close in time). In another example, the facts relevant to *Georgia Pacific* factors 4 and 5—the commercial relationship between the parties and the facts and circumstances surrounding Unwired's patent licensing program—have changed dramatically over time. In the mid-2000s, Unwired (then Openwave Systems, Inc.) was a software company in Silicon Valley. Then, in 2009, Unwired engaged in its first patent enforcement action and began seeking revenue through patent licenses, transitioning from an innovator in software to a patent assertion entity. In 2011, Openwave divested all of its operating assets and became Unwired Planet, a pure patent licensing entity. Other *Georgia Pacific* factors will inherently vary from patent to patent. *See, e.g.*, factor 9 ("The utility and advantages of the patent property . . . ."); factor 10 ("The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."); factor 11 ("The extent to which the infringer has made use of the invention.").

### (b)      Hypothetical Negotiation Dates

The variety of accused products also creates a particularly complex damages analysis because each accused product will be entitled to a different hypothetical negotiation date that depends on the date that the accused infringement began. Each product or service accused of infringing the patents-in-suit entered the market at a different time between 2005 and 2013: Google Cloud Messaging launched in June 2012; Cloud to Device Messaging launched in May 2010; Google Play launched in October 2008; Google My Location launched in November 2007; Google Maps launched in February 2005; and Google Earth launched in June 2005. The date of the hypothetical negotiation (under the reasonable royalty analysis) must be on or before the date when the alleged infringement first began. *See Hanson*, 718 F.2d at 1079 ("The key element in setting a reasonable royalty . . . is the necessity for return to the date when the infringement began." (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (6th Cir. 1978))); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1116 (N.D. Cal. 2011) ("The hypothetical negotiation must be scheduled as of *the time infringement began*."). Thus, the jury

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

will potentially be asked to conduct up to sixteen different "hypothetical negotiations" for each accused product with respect to each patent-in-suit the product is accused of infringing, taking into account the facts with respect to the fifteen *Georgia Pacific* factors at multiple different points in time.  *Cf. Applied Med.*, 435 F.3d at 1361-62 ("Because [two different accused products] caused two separate infringements, and each infringement commenced on a different date, it follows that the reasonable royalties may well be different from each other.").

### (c)    Relevant Licenses For Assessing A Reasonable Royalty

Damages evidence includes relevant licenses, the number of which may increase as the number of products increases.  Because nine products are accused, the number of potentially relevant licenses could be quite high.  For example, Unwired has executed several patent licenses that cover all of the patents-in-suit (as well as other patents).  Google has also entered into license agreements that may or may not be relevant to the reasonable royalty calculation.  The Federal Circuit "require[s] district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit."  *ResQNet.com*, 594 F.3d at 869.  For example, the jury in this case will have to consider whether all of these licenses are "sufficiently comparable to the hypothetical license at issue" for each patent-in-suit.  *Lucent Techs.*, 580 F.3d at 1326.  The probative value of each license under consideration may also be affected by how close in time it is to the hypothetical negotiation.  *See LaserDynamics*, 694 F.3d at 81.

### (d)    Business Models, Revenues, And Costs

The accused products are also each associated with different business models and different revenues and costs.  For example, Google Play generates revenue through the sale of applications and content such as movies, books, and music.  Google Maps and Google Cloud Messaging are services that are free to users.  Google Maps generates revenue, for instance, through customers that pay to have advertisements within the Google Maps Application.  Google Apps Mobile Management, on the other hand, is a feature that may be used by customers of Google Apps for Business, an enterprise offering of various Google applications (Gmail, Calendar, etc.).  Thus, the damages analysis for each of the accused products will involve unique facts surrounding the

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

revenues and benefits associated with that product, as well as a determination of how those revenues and benefits should be attributed to the patented feature as opposed to the product's various other features. *See, e.g.*, *ResQNet.com*, 594 F.3d at 869 ("[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place."); *Georgia-Pacific*, 318 F. Supp. at 1120 (relevant factors include "the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer").

### (e)      Willful Infringement Allegations

Unwired's willful infringement allegations add a further layer of complexity to the trial. A finding of willful infringement allows an award of enhanced damages under 35 U.S.C. § 284. The question of willful infringement involves highly complex questions of both fact and law, including an objective and subjective prong, which both the Judge and jury would have to evaluate in the event that any willful infringement allegations proceed to trial. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc) (to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent"; once this "threshold objective standard" is satisfied, the patentee must also demonstrate that this objectively-defined risk "was either known or so obvious that it should have been known to the accused infringer"); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc*., 682 F.3d 1003, 1008 (Fed. Cir. 2012) (holding that the "subjective" prong is a question of fact and that the "objective" prong, while "predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to *de novo* review").

To exacerbate the already complex legal framework for willful infringement, the Court and the jury may be required to assess willful infringement separately for each patent-in-suit. Although some proffered evidence of willfulness may relate to Google's knowledge of the patent portfolio generally, the jury will also have to consider evidence of when Google first learned of each patent-in-suit and Google's knowledge and intent with respect to individual patents. To the extent any issues of willfulness proceed to trial, the jury might be called upon to evaluate whether

the risk of infringing each of the patents-in-suit was "known" or "obvious" to Google. If the Court were to grant Google's motion for bifurcation, the jury could be spared from additionally having to evaluate Google's state of mind as to the possibility that it is infringing each of the patents-in-suit.

Willfulness is more logically tried with damages as opposed to with liability because, as discussed below, the proof required to establish infringement and willfulness does not overlap; patent infringement is a strict liability offense, whereas willfulness requires proof of intent. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1317 (Fed. Cir. 2013); *AVIA Grp.*, 1991 WL 340569, at *2. Overlapping these two separate liability standards would be confusing for the jury. As the Federal Circuit held in *Bosch*, courts traditionally "determine willfulness as part of an accounting, which occur[s] after the finding of liability." 719 F.3d at 1318.

In sum, because of the complexity of the liability, damages, and willfulness issues in this case, the interests of fairness and avoiding jury confusion favor bifurcation of liability from damages and willfulness. *See Ciena Corp.*, 210 F.R.D. at 521; *British Telecomms.*, 2013 WL 3814329, at *2.

**C.      Bifurcation Of Liability Is Likely To Substantially Narrow The Damages Issue For Trial And Reduce The Discovery Burden On The Court And The Parties**

A further, substantial benefit of bifurcation is that it may avoid unnecessary damages litigation and, in turn, preserve significant judicial and party resources. *See, e.g.*, *Medtronic, Inc. v. W.L. Gore & Assocs., Inc.*, No. 06-4455, 2008 WL 5158997, at * 1 (N.D. Cal. Dec. 9, 2008) ("[Based on] the number of accused devices and the number of claims at issue, it is possible that a jury's findings at the liability phase would significantly narrow what damages are available to Medtronic."); *Industrias Metalicas Marva, Inc. v. Lausell*, 172 F.R.D. 1, 5-6 (D.P.R. 1997) (advantages of bifurcation include the possibility that only the initial liability trial will be necessary, the possibility that the alleged infringer's confidential documents relating to damages would be protected from discovery, and the simplification of issues); *Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 983-84 (D. Del. 1982) ("[I]f any of the liability issues are resolved in [defendants'] favor, no further trial will be necessary. On the other hand, if the liability issues are

resolved in [plaintiff's] favor, then [defendants] might very well settle the damages to avoid the lengthy trial."), *aff'd*, 758 F.2d 668 (Fed. Cir. 1984).

Bifurcating also will result in significant efficiencies. With up to fifteen asserted claims from six patents, five of them unrelated, a finding that even a handful of these claims are invalid or not infringed would substantially limit the damages issues to be tried later. Eliminating some of all of the damages issues in the case (and the burdensome tasks that come with it, including damages expert reports and related motions *in limine*) would benefit not only the parties but also the Court. *See Bosch* Order at 1 ("[D]iscovery disputes related to document production on damages and the *Daubert* motion practice related to damages experts are a drain on scarce judicial resources."); *HTC Corp. v. Tech. Props. Ltd.*, No. 08-0882-PSG, 2013 WL 4787509, at *1 (N.D. Cal. Sept. 6, 2013) ("Another patent case on the eve of trial, another Daubert motion to strike a patent damages expert's testimony. . . . [S]uch motions have become a routine affair in patent litigation.").

Google also asks the Court to stay the damages issues with respect to the patents-in-suit until after Federal Circuit review of all liability issues. In *Bosch*, the Federal Circuit recently approved of this practice in view of the "substantial reversal rate of liability determinations on appeal" and the resulting waste resulting from a damages trial predicated on a liability finding that is later reversed. Bosch, 719 F.3d at 1313-18. The potential efficiencies of a stay pending appeal of liability issues are particularly great in this case because, according to a recent study, software patents of the type at issue here lead to particularly high reversal rates. *See* Shawn P. Miller, *Do "Fuzzy" Software Patent Boundaries Explain High Claim Construction Reversal Rates* at 2 (Feb. 7, 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2139146 (explaining in the context of software patents, 40% of cases are reversed due to claim construction errors). A stay pending appeal would also provide an opportunity for settlement after the parties have heard from the Federal Circuit. As the District of Delaware has explained, "bifurcation promotes the just and efficient resolution of what damages, if any, should [be] awarded by: (1) giving the parties—those with the most expertise in the market—the first opportunity to translate the Federal Circuit's final legal decision on liability into practical commercial consequences; or (if the parties

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

cannot resolve the matter) (2) giving the damages jury a focused dispute to resolve." *Bosch Order* at 2; *Dutch Brand* Order at 2.  Although Google anticipates that the PTO, this Court, and the Federal Circuit will ultimately conclude that all asserted patents are invalid and/or not infringed— obviating the need for any second trial—Google acknowledges the possibility of a second trial in this case if: (1) any patents-in-suit are found valid and infringed and that finding is upheld by the Federal Circuit; or (2) any stayed patents survive PTO review and appeal to the Federal Circuit. The six patents-in-suit and the three stayed patents that are under review at the PTO are on separate and independent tracks.  If they do come back to the Court following appeal, however, the timing fortuitously works out such that any stayed patents and any remanded patents-in-suit likely would return to the district court at approximately the same time, sometime in Spring 2016. *See* Timeline, attached as Ex. JF.  This would allow any unresolved issues to be resolved on a single track in a single trial.

> **D.** **The Resolution of Liability Requires Little or No Overlap in the Proof Required to Establish Damages and Willfulness**

Liability and damages in patent cases involve largely separate bodies of evidence. The evidence in the liability phase of this trial would involve, for example, Google's source code, and testimony from Google engineers' and both parties' technical experts about whether that source code performs the steps described in the asserted claims. With respect to patent validity, the liability phase will also involve expert testimony regarding prior art references and the knowledge of one of ordinary skill in the art at the time the purported inventions were conceived.  The evidence in the damages phase, by contrast, would involve, for example, Google's and Unwired's license agreements, the nature of the commercial relationship between the parties, and expert testimony about how those license agreements and commercial relationship might inform a hypothetical negotiation between the parties. *See Georgia-Pacific*, 318 F. Supp. at 1120.

To be sure, in a damages trial, the jury would need to be introduced to the patent so that it has some idea of the "nature of the patented invention." *See id.* (factor 10).  The depth of the technical understanding required in the liability and damages phases, however, would be very different.  The damages trial would not need any in-depth comparison of the steps of the claim to

Google's source code, but would simply require a high-level introduction to the nature of the claimed invention.  Likewise, if any of the patents were found valid and infringed, the jury in the damages phase might be asked to consider facts about the "extent to which the infringer has made use of the invention." *See id.* (factor 11).  However, there would be a significant difference in the analysis required in the liability trial (comparing Google's source code to the patent claims) and in a damages trial (considering evidence, e.g., of the number of people who use the accused product).

Finally, the "commercial success" (or lack thereof) of the claimed invention may be relevant in the liability phase. Specifically, "commercial success" is one of several "secondary" indicia of non-obviousness.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). Courts have rejected this as a basis to deny bifurcation, however, because "the evidence introduced to show commercial success [in the liability phase] will be less extensive and of a different character from that to prove damages.  The question of commercial success is not ordinarily determined by a detailed analysis of exhaustive and intricate financial data, such as is required for proof of damages, but rather by whether the claimed invention is, broadly speaking, an accepted product and a big seller." *Paine Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112, 1116 (D. Del. 1984). In fact, some courts have proceeded to trial of patent liability issues without even allowing damages *discovery*, holding that "limited damages discovery may be relevant for . . . the issue of commercial success," but the "drain on [the court's] scarce judicial resources" caused by damages discovery outweighs any potential relevance of damages discovery during the liability phase of trial. *Bosch* Order at 1; *Dutch Brand* at 1-2. The District of Oregon—relying on *Paine Webber*—held that any overlap regarding evidence of commercial successes was not "great enough to justify denial of bifurcation." *AVIA Grp.*, 1991 WL 340569, at *3.

Similarly, bifurcation of willfulness will not require duplication of proof.  *See Bosch*, 719 F.3d at 1317.  "Because intent is irrelevant to a determination of patent infringement, there is no overlap concerning willfulness between the issue of liability and damages." *AVIA Grp.*, 1991 WL 340569, at *2.  In *Bosch*, the district court concluded and the Federal Circuit agreed "that willfulness and infringement present different underlying issues and, at least generally speaking,

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

require different proof." 719 F.3d at 1317; *see also Bosch* Order at 2-3 ("[W]illfulness requires qualitatively and quantitatively different proof than does infringement and, therefore, need not be tried at the same time.").

### E.   Bifurcation Would Not Unduly Prejudice Unwired Because Google And Unwired Are Not Competitors

Bifurcation and stay of damages and willfulness issues would not cause any undue prejudice in this case, because Google and Unwired are not market competitors. *See, e.g.*, *British Telecomms.*, 2013 WL 3814329, at *2. Where parties are not in competition, the prejudice to the plaintiff resulting from any delay in damages, i.e., continuing the *status quo*, is minimal. In the *British Telecommunications* case against Google, the court held that "because the parties are not competitors—and [the plaintiff] does not practice the patented technology—and many years passed between the issuance of the patents and [the plaintiff]'s decision to initiate suit against Google, the prejudice to [the plaintiff] from any delay resulting from bifurcation does not render bifurcation inappropriate." 2013 WL 3814329, at *2. Even in the context of "major competitors," courts have held that delay alone is not sufficiently prejudicial to overcome a compelling case for bifurcation. *See Industrias Metalicas*, 172 F.R.D. at 1, 9. In *Industrias Metalicas*, the court held, in the context of "major competitors in the Puerto Rico window market," that any harm from delay "could be remedied at the damages phase." *Id.* The court stated: "Actually, bifurcation has the potential to save [plaintiff] substantial litigation fees, just as it does for [defendant]." *Id.* at 9.

Here, in the context of Google's motion for stay pending PTO review, the Court has already found that "the parties do not directly compete against each other," which "lessens the risk of prejudice to the non-moving party." *See* Dkt. No. 233 at 11. It is also the case here, as in *British Telecommunications*, that Unwired waited many years after the asserted patents issued to initiate its lawsuit against Google. The patents-in-suit issued all issued by 2005. *See* Ex. B to G. It was not until late 2012 that Unwired filed this lawsuit. Accordingly, "any delay resulting from bifurcation does not render bifurcation inappropriate." *British Telecomms.*, 2013 WL 3814329, at *2.

## III.   CONCLUSION

23178666.2

-19-

3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

For these reasons, Google respectfully asks the Court to bifurcate the issues of liability from damages and willfulness for trial, and to stay discovery and proceedings related to damages and willfulness until after the Federal Circuit finally adjudicates liability issues on appeal.

DATED:  April 4, 2014

MUNGER, TOLLES & OLSON LLP
GORDON SILVER

> PETER E. GRATZINGER
> JOHN P. DESMOND

By: _____/s/ John P. Desmond_____
JOHN P. DESMOND
PETER E. GRATZINGER
Attorneys for Defendant
GOOGLE INC.

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS
AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS

**CERTIFICATE OF SERVICE**

I certify that, on April 4, 2014, I served a true and correct copy of **DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY RELATED TO DAMAGES** upon the following counsel of record through the Court's CM/ECF system:

Theodore Stevenson, III
Kevin L. Burgess
Pierre J. Hubert
David Sochia
John F. Garvish, III
Mieke K. Malmberg
Kevin M. Kneupper
Nicholas M. Mathews
James E. Quigley
Mario A. Apreotesi
Ashley N. Moore
Warren Lipschitz
MCKOOL SMITH P.C.
3000 Crescent Court, Suite 1500
Dallas, TX 75201

Michael D. Rounds
Adam K. Yowell
Ryan J. Cudnik
WATSON ROUNDS
5371 Kietzke Lane
Reno, NV 89511

DATED: April 4, 2014

                                    /s/ Cindy S. Grinstead
                                  An Employee of Gordon Silver

23178666.2

-21-

3:12-cv-504-MMD-VPC

DEFENDANT GOOGLE INC.'S MOTION TO BIFURCATE LIABILITY FROM DAMAGES AND WILLFULNESS AND TO STAY DISCOVERY AND PROCEEDINGS RELATED TO DAMAGES AND WILLFULNESS